UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- x

MERRILL LYNCH CAPITAL SERVICES, INC.,          :
                                               :
                        Plaintiff,             :       No. 10-cv-5223 (DAB)
                                               :
            v.                                 :
                                               :
PRAIRIE PRIDE, INC.,                           :
                                               :
                        Defendant.             :
-------------------------------------------------------------- x

STATE OF NEW YORK          )
                           )     S.S.:
COUNTY OF NEW YORK         )

## AFFIDAVIT OF PETER E. WILSON

PETER E. WILSON, being duly sworn, deposes and states as follows:

1.      I am the Vice President - Special Assets Group at Bank of America.  I

make this declaration based on my personal knowledge of the facts set forth herein and am

competent to testify as to the same if called upon to do so.

2.      A plain vanilla interest rate swap is a transaction in which one party is

required to make periodic payments of an amount calculated by applying a fixed rate of interest

to a notional amount, and the other party is required to make periodic payments calculated by

applying a floating (or variable) rate of interest, such as the London Interbank Rate ("LIBOR"),

to the notional amount.

3.      Parties entering into interest rate swaps often utilize a standard form

Master Agreement (Multicurrency-Cross Border) ("Master Agreement") issued by the

International Swaps Dealers Association, Inc. ("ISDA").   The Master Agreement sets forth the

general terms that govern interest rate swaps.  A Master Agreement is attached hereto as Exhibit A.

4.       The economic terms of a specific interest rate swap transaction are evidenced and memorialized by a confirmation, which includes the trade date, the applicable interest rates, the notional amount, and the effective and termination dates.

5.       Prairie Pride, Inc. ("Prairie Pride") and Merrill Lynch Capital Services, Inc. ("MLCS") entered into two plain vanilla interest rate swap agreements, the terms of which are memorialized in two written confirmations (the "Confirmations") between the parties.

6.       The first interest rate swap transaction between Prairie Pride and MLCS is evidenced and confirmed by a confirmation dated August 17, 2006, bearing Merrill Lynch Reference No. 06DL18775, 2857059 (the "August 17, 2006 Swap Agreement").  A copy of the August 17, 2006 Swap Agreement is attached as Exhibit B.  The August 17, 2006 Swap Agreement had a notional amount of $16,000,000.00, on which (a) Prairie Pride agreed to pay a fixed rate of 5.47% per annum, and (b) MLCS agreed to pay a floating rate based on the LIBOR one month rate.  The August 17, 2006 Swap Agreement has an Effective Date of November 1, 2007 and a Termination Date of November 1, 2012.  Beginning in December 2007, Prairie Pride performed its obligations and made payments as required by the August 17, 2006 Swap Agreement.

7.       The second interest rate swap transaction between Prairie Pride and MLCS is evidenced and confirmed by a confirmation dated January 26, 2007, bearing Merrill Lynch Reference No. 06DL28466, 3078850 (the "January 26, 2007 Swap Agreement").  A copy of the January 26, 2007 Swap Agreement is attached as Exhibit C.   The January 26, 2006 Swap Agreement has a notional amount of $36,000,000.00, on which (a) Prairie Pride agreed to pay a

fixed rate of 4.94% per annum, and (b) MLCS agreed to pay a floating rate based on the LIBOR one month rate. The January 26, 2007 Swap Agreement has an Effective Date of April 30, 2008 and a Termination Date of April 30, 2013. Beginning in May 2008, Prairie Pride performed its obligations and made payments as required by the January 26, 2007 Swap Agreement.

8.      From December 2007 through January 2009, Prairie Pride made payments of approximately $985,000 pursuant to the Swap Agreements. Then, at the beginning of 2009, Prairie Pride stopped making payments. On January 30, 2009, Prairie Pride failed to make a payment that was due under the January 26, 2007 Swap Agreement; and on February 2, 2009, Prairie Pride failed to make a payment that was due under the August 17, 2006 Swap Agreement. From January 2009 through May 2010, Prairie Pride failed to make any of the payments that were due under the Swap Agreements. I note that at the beginning of 2009, the parties agreed to defer, but not waive, certain payments. In total, Prairie Pride failed to make 32 payments, totaling $3,059,960.87.

9.      On May 3, 2010, MLCS sent Prairie Pride a Notice of Default, in which MLCS notified Prairie Pride that Prairie Pride failed to make payments under the Swap Agreements. A copy of the Notice of Default is attached hereto as Exhibit D. Pursuant to section 5(a)(i) of the Master Agreement, MLCS notified Prairie Pride that it had three "Local Business Days" to remedy the payment default. MLCS further warned that Prairie Pride's failure to remedy the payment default would result in an Event of Default under the Master Agreement and that MLCS would pursue its rights and remedies thereunder.

10.     Three Local Business Days passed, and Prairie Pride did not remedy its payment default. Thus, on May 7, 2010, MLCS notified Prairie Pride that it was terminating the Swap Agreements and designating May 11, 2010 as the Early Termination Date. A copy of the

May 7th Letter is attached hereto as Exhibit E. The May 7th Letter further informed Prairie Pride that as soon as possible on or following the Early Termination Date, MLCS would send to Prairie Pride a statement of amounts payable pursuant to Section 6(e)(i) of the Master Agreement.

11.     On May 14, 2010, MCLS sent Prairie Pride a statement of amounts payable under the Swap Agreements pursuant to Section 6(e)(i) of the Master Agreement. The total amount due and payable by Prairie Pride to MLCS was $6,416,210.76 (which included past due payments totaling $3,059,960.87 plus the Market Quotation of the value of the Swap Agreements determined pursuant to the Master Agreement), plus appropriate interest. A copy of the May 14th Letter is attached hereto as Exhibit F. To date, Prairie Pride has not remitted payment to MLCS.

12.     MLCS performed its obligations under the Swap Agreements at all times.

Dated: _July 1_____, 2010

_____
Peter E. Wilson

Subscribed and sworn to before me on

_____
Notary Public

My commission expires on

**LOGAN SHIRLEY A**
**Notary Public - State of New York**
**No. 01LO4955022**
**Qualified in Queens County**
**My Commission Expires Aug. 28, 2013**

# EXHIBIT A

(Multicurrency — Cross Border)



International Swap Dealers Association, Inc.

# MASTER AGREEMENT

dated as of .......................................

........……………………………..…..….......… and ……….……………….....………………….........

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows: —

**1.    Interpretation**

(a)    *Definitions*. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)    *Inconsistency*.  In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)    *Single Agreement*.  All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2.    Obligations**

(a)    *General Conditions*.

(i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii) Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap Dealers Association, Inc.

(b)     *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)     *Netting.* If on any date amounts would otherwise be payable:—

    (i)   in the same currency; and

    (ii)  in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)     ***Deduction or Withholding for Tax.***

    (i)   *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)   promptly notify the other party ("Y") of such requirement;

        (2)   pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)   promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)   if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)   the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)   the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii)    *Liability*. If: —

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    *Default Interest; Other Amounts.* Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3.    Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:—

(a)    *Basic Representations.*

(i)    *Status*. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    *Powers*. It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii)    *No Violation or Conflict*. Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv)    *Consents*. All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v)    *Obligations Binding*. Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

ISDA® 1992

(b)    *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)    *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)    *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)    *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)    *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4.    Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)    *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

(i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii)    any other documents specified in the Schedule or any Confirmation; and

(iii)    upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)    *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)    *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)    *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)    *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

5.       **Events of Default and Termination Events**

(a)      *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

     (i)   *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

     (ii)   *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

     (iii)   *Credit Support Default.*

        (1)   Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

        (2)   the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

        (3)   the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

     (iv)   *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

     (v)   *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

     (vi)   *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

ISDA® 1992

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) *Bankruptcy*. The party, any Credit Support Provider of such party or any applicable Specified Entity of such party: —

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) *Merger Without Assumption*. The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer: —

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)     *Termination Events*. The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality*. Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party): —

        (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event*. Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger*. The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger*. If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event*. If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality*. If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

        **ISDA® 1992**

6.    **Early Termination**

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If: —

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

8                                                        ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c) *Effect of Designation.*

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d) *Calculations.*

(i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e) *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)     *Events of Default.* If the Early Termination Date results from an Event of Default: —

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii) **Termination Events**.  If the Early Termination Date results from a Termination Event: —

(1) *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties*. If there are two Affected Parties: —

(A) if Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B) if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii) **Adjustment for Bankruptcy**. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv) **Pre-Estimate**. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

**7.    Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)      a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)      a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

**8.    Contractual Currency**

(a)      *Payment in the Contractual Currency*. Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)      *Judgments*. To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)      *Separate Indemnities*. To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)      *Evidence of Loss*. For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**ISDA® 1992**

9.    **Miscellaneous**

(a)    *Entire Agreement*. This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations*. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative*. Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations*.

(i) This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii) The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights*. A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings*. The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

10.    **Offices; Multibranch Parties**

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

11.    **Expenses**

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.      Notices**

(a)      *Effectiveness*. Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

>    (i)     if in writing and delivered in person or by courier, on the date it is delivered;

>    (ii)    if sent by telex, on the date the recipient's answerback is received;

>    (iii)   if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

>    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

>    (v)     if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)      *Change of Addresses*. Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.      Governing Law and Jurisdiction**

(a)      *Governing Law*. This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)      *Jurisdiction*. With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

>    (i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

>    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)      *Service of Process*. Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

**ISDA® 1992**

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities*. Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.     Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

14

**ISDA® 1992**

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

15

ISDA® 1992

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of: —

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meanings specified in the Schedule.

16                                                                ISDA® 1992

*"Specified Indebtedness"* means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

*"Specified Transaction"* means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

*"Stamp Tax"* means any stamp, registration, documentation or similar tax.

*"Tax"* means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

*"Tax Event"* has the meaning specified in Section 5(b).

*"Tax Event Upon Merger"* has the meaning specified in Section 5(b).

*"Terminated Transactions"* means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

*"Termination Currency"* has the meaning specified in the Schedule.

*"Termination Currency Equivalent"* means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

*"Termination Event"* means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

*"Termination Rate"* means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

*"Unpaid Amounts"* owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been  but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

17

ISDA® 1992

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

................................................................          ................................................................
(Name of Party)                                                  (Name of Party)


By: ............................................................          By: ............................................................
    Name:                                                            Name:
    Title:                                                           Title:
    Date:                                                            Date:

18                                                 ISDA® 1992

**(Multicurrency — Cross Border)**

# ISDA®

International Swap Dealers Association, Inc.

## SCHEDULE
## to the
## Master Agreement

dated as of .................................................................

between ............................................................... and ...............................................................
                  ("Party A")                                      ("Party B")

Part 1.  **Termination Provisions.**

(a)  *"Specified Entity"* means in relation to Party A for the purpose of: —

Section 5(a)(v),  ...................................................................................................

Section 5(a)(vi),  ...................................................................................................

Section 5(a)(vii),  ...................................................................................................

Section 5(b)(iv),  ...................................................................................................

and in relation to Party B for the purpose of:—

Section 5(a)(v),  ...................................................................................................

Section 5(a)(vi),  ...................................................................................................

Section 5(a)(vii),  ...................................................................................................

Section 5(b)(iv),  ...................................................................................................

(b)  *"Specified Transaction"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here  ...................................................................................................

...................................................................................................

...................................................................................................

(c)  The *"Cross Default"* provisions of Section 5(a)(vi) will/will not * apply to Party A
                                                  will/will not * apply to Party B

If such provisions apply:—

*"Specified Indebtedness"* will have the meaning specified in Section 14 of this Agreement unless

another meaning is specified here ...................................................................................................

...................................................................................................

---

\*   Delete as applicable.

**ISDA® 1992**

*"Threshold Amount"* means .........................................................................................................

........................................................................................................................................................

(d)   The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will/will not * apply to Party A

will/will not * apply to Party B

(e)   The *"Automatic Early Termination"* provision of Section 6(a) will/will not * apply to Party A

will/will not * apply to Party B

(f)   *Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement: —

(i)   Market Quotation/Loss * will apply.

(ii)  The First Method/The Second Method * will apply.

(g)   *"Termination Currency"* means ........................................................ , if such currency is specified and
freely available, and otherwise  United States Dollars.

(h)   *Additional Termination Event*  will/will not apply*. The following shall constitute an  Additional

Termination Event: —  ...........................................................................................................................

..............…… ...................................................................................................................................

........................................................................................................................................................

........................................................................................................................................................

........................................................................................................................................................

........................................................................................................................................................

For the purpose of the foregoing Termination Event, the Affected Party or Affected  Parties shall be: —  ...

........................................................................................................................................................

Part 2. **Tax Representations.**

(a)   *Payer Representations.* For the purpose of Section 3(e) of this Agreement, Party A will/will not* make the
following representation and Party B will/will not* make the following representation: —

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue
authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax
from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made
by it to the other party under this Agreement. In making this representation, it may rely on (i) the accuracy
of  any representations made by the other party pursuant to Section 3(f) of this Agreement, (ii) the
satisfaction of the agreement contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy
and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of
this Agreement and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of
this Agreement, *provided* that it shall not be a breach of this representation where reliance is placed on
clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of
material prejudice to its legal or commercial position.

(b)   *Payee Representations.* For the purpose of Section 3(f) of this Agreement, Party A and Party B make the
representations specified below, if any:

(i)    The following representation will/will not* apply to Party A and will/will not apply to Party B: —

It is fully eligible for the benefits of the "Business Profits" or "Industrial and Commercial Profits"
provision, as the case may be, the "Interest" provision or the "Other Income" provision (if any) of the
Specified Treaty with  respect to any  payment described in such provisions and received or to be received

---

\*   Delete as applicable.

**ISDA® 1992**

by it in connection with this Agreement and no such payment is attributable to a trade or business carried on by it through a permanent establishment in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Treaty"* means with respect to Party A      ............................................................................

*"Specified Jurisdiction"* means with respect to Party A      .....................................................................

*"Specified Treaty"* means with respect to Party B      ............................................................................

*"Specified Jurisdiction"* means with respect to Party B      .....................................................................

(ii)   The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the Specified Jurisdiction.

If such representation applies, then: —

*"Specified Jurisdiction"* means with respect to Party A      .....................................................................

*"Specified Jurisdiction"* means with respect to Party B      .....................................................................

(iii)   The following representation will/will not* apply to Party A and will/will not* apply to Party B: —

(A)   It is entering into each Transaction in the ordinary course of its trade as, and is, either (1) a recognised U.K. bank or (2) a recognised U.K. swaps dealer (in either case (1) or (2), for purposes of the United Kingdom Inland Revenue extra statutory concession C17 on interest and currency swaps dated March 14, 1989), and (B) it will bring into account payments made and received in respect of each Transaction in computing its income for United Kingdom tax purposes.

(iv)   Other Payee Representations: —   ..........................................................................................

................................................................................................................................................

................................................................................................................................................

................................................................................................................................................

N.B. The above representations may need modification if either party is a Multibranch Party.

---

* Delete as applicable.

ISDA® 1992

Part 3. **Agreement to Deliver Documents**.

For the purpose of Sections 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents, as applicable: —

(a) Tax forms, documents or certificates to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| ............................... | ............................... | ............................... |
| ............................... | ............................... | ............................... |
| ............................... | ............................... | ............................... |
| ............................... | ............................... | ............................... |
| ............................... | ............................... | ............................... |

(b) Other documents to be delivered are: —

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|
| ............................... | ............................... | ............................... | Yes/No* |
| ............................... | ............................... | ............................... | Yes/No* |
| ............................... | ............................... | ............................... | Yes/No* |
| ............................... | ............................... | ............................... | Yes/No* |
| ............................... | ............................... | ............................... | Yes/No* |

Part 4. **Miscellaneous**.

(a)    *Addresses for Notices*. For the purpose of Section 12(a) of this Agreement: —

Address for notices or communications to Party A: —

Address:    ............................................................................................................................

Attention:    ............................................................................................................................

Telex No.: ..............................................    Answerback: ..............................................

Facsimile No.: ..............................................    Telephone No: ..............................................

Electronic Messaging System Details: ...................................................................................

Address for notices or communications to Party B: —

Address:    ............................................................................................................................

Attention:    ............................................................................................................................

Telex No.: ..............................................    Answerback: ..............................................

---

* Delete as applicable.

Facsimile No.: ................................................. Telephone No.: ...............................................

Electronic Messaging System Details: ...............................................................................

(b)  *Process Agent.* For the purpose of Section 13(c) of this Agreement: —

Party A appoints as its Process Agent  ..........................................................................

Party B appoints as its Process Agent  ..........................................................................

(c)  *Offices.* The provisions of Section 10(a) will/will not* apply to this Agreement.

(d)  *Multibranch Party.* For the purpose of Section 10(c) of this Agreement: —

Party A is/is not* a Multibranch Party and, if so, may act through the following Offices: —

................................   ................................   ................................

................................   ................................   ................................

Party B is/is not* a Multibranch Party and, if so, may act through the following Offices: —

................................   ................................   ................................

................................   ................................   ................................

(e)  *Calculation Agent.* The Calculation Agent is ..............................................., unless otherwise specified in a Confirmation in relation to the relevant Transaction.

(f)  *Credit Support Document.* Details of any Credit Support Document: — ........................................
.................................................................................................................................
.................................................................................................................................
.................................................................................................................................

(g)  *Credit Support Provider.* Credit Support Provider means in relation to Party A, ...............................
.................................................................................................................................
.................................................................................................................................

Credit Support Provider means in relation to Party B, ...........................................................
.................................................................................................................................
.................................................................................................................................

(h)  *Governing Law.* This Agreement will be governed by and construed in accordance with English law/the laws of the State of New York (without reference to choice of law doctrine) *.

---
\* Delete as applicable.

**ISDA® 1992**

(i)  *Netting of Payments*. Subparagraph (ii) of Section 2(c) of this Agreement will not apply to the following Transactions or groups of Transactions (in each case starting from the date of this Agreement/in each case starting from …………………………… *) ………………………………………

…………………………………………………………………………………………………………

…………………………………………………………………………………………………………

(j)  *"Affiliate"* will have the meaning specified in Section 14 of this Agreement unless another meaning is specified here

…………………………………………………………………………………………………………

…………………………………………………………………………………………………………

Part 5. **Other Provisions.**

---

* Delete as applicable.

**ISDA® 1992**

# EXHIBIT B

 **Merrill Lynch**

DATE:          AUGUST 17, 2006

TO:            PRAIRIE PRIDE, INC. ("Counterparty")
ATTENTION:     DAVID SWEARINGIN
TEL.:          417-667-3300
FAX:           417-667-3066

FROM:          MERRILL LYNCH CAPITAL SERVICES, INC. ("MLCS")
CONTACT:       MOLLY MERRIGAN
EMAIL:         Molly_Merrigan@ml.com
TEL:           212-449-8829
FAX:           917-778-0836

RE:            SWAP TRANSACTION

ML REF:        06DL18775, 2857059

Dear Sir or Madam:

        The purpose of this communication is to confirm the terms and conditions of the transaction entered into between us on the Trade Date specified below (the "Transaction"). This communication constitutes a "Confirmation" as referred to in the Agreement specified below.

        The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. For these purposes, all references in those Definitions to a "Swap Transaction" shall be deemed to apply to the Transaction referred to herein. In the event of any inconsistency between the Definitions and this Confirmation, the terms of this Confirmation shall govern.

        This Confirmation evidences a complete and binding agreement between you and us as to the terms of the Transaction to which this Confirmation relates.   In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "Master Form"), with such modifications as you and we will in good faith agree (the "Agreement").   Upon the execution by you and us of the Agreement, this Confirmation will supplement, form a part of, and be subject to the Agreement. All provisions contained in or incorporated by reference in the Agreement upon its execution will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents referring to the Master Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Master Form as if we had executed an agreement in such form (but without any Schedule except for the election of the laws of the State of New York as the governing law and US Dollars as the Termination Currency) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The terms of the particular Transaction to which the Confirmation relates are as follows:

Notional Amount:               USD 16,000,000.00

Trade Date:                    August 16, 2006

 **Merrill Lynch**

| | |
|---|---|
| Effective Date: | November 1, 2007 |
| Termination Date: | The earlier of i) November 1, 2012, subject to adjustment in accordance with the Modified Following Business Day Convention or ii) the Optional Termination Date as defined below under Other Provisions. |
| Fixed Amounts : | |
| Fixed Rate Payer : | Counterparty |
| Fixed Rate Payer Payment Date: | The 1st day of each month in each year, commencing on December 1, 2007 and ending on the Termination Date, inclusive, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate : | 5.470000% per annum |
| Fixed Rate Payer : Day Count Fraction: | Actual/360 |
| No Adjustment of Period End Dates: | Inapplicable |
| Floating Amounts : | |
| Floating Rate Payer : | MLCS |
| Floating Rate Payer Payment Date: | The 1st day of each month in each year, commencing on December 1, 2007 and ending on the Termination Date, inclusive, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | One Month |
| Spread: | Inapplicable |
| Floating Rate Payer : Day Count Fraction: | Actual/360 |
| No Adjustment of Period End Dates: | Inapplicable |
| Reset Dates: | The first day of each Floating Rate Payer Calculation Period |



| | |
|---|---|
| Rate Cut-Off Dates: | Inapplicable |
| Averaging: | Inapplicable |
| Compounding: | Inapplicable |
| Business Days: | New York and London |
| Calculation Agent: | MLCS unless otherwise specified in the Agreement |
| Other Provisions: | MLCS and Counterparty agree that MLCS shall have the right to elect that in the event that the Agreement and the Credit Support Annex is not executed within 90 calendar days of the Trade Date of this Transaction, this Transaction shall be terminated effective as of the day that is 90 calendar days after the Trade Date, (or if such a day is not a Business Day, on the next succeeding Business Day)(the "Optional Termination Date"). Such right may be exercised by notice to the other party not less than five Business Days preceding the Optional Termination Date. In the event that MLCS exercises its right to terminate this Transaction, MLCS and Counterparty shall attempt to agree on an amount payable by one party to the other on the Optional Termination Date in respect of such termination. If the parties fail to agree on such an amount prior to the second Local Business Day preceding such Optional Termination Date, MLCS shall determine the "Market Quotation" for this Transaction (as defined in Section 14 of the Agreement, but based on Reference Market-makers' mid-market quotations) for value on the Optional Termination Date. The Market Quotation shall be paid by the relevant party on the Optional Termination Date, and this Transaction shall terminate on the Optional Termination Date with no further rights and obligations of either party, except for the obligation to make payment of the Market Quotation, provided, however, that if the Agreement and the Credit Support Annex is executed prior to the Optional Termination Date, then, unless the parties otherwise agree, notwithstanding that notice of termination has been given, this Transaction shall not be terminated and the Market Quotation shall not be payable hereunder. |



Non-Reliance:                          Each party represents to the other party that it is
                                       acting for its own account, and has made its own
                                       independent decisions to enter into this Transaction
                                       and as to whether this Transaction is appropriate or
                                       proper for it based on its own judgment and upon
                                       advice from such advisors as it has deemed
                                       necessary.  It is not relying on any communication
                                       (written or oral) of the other party as investment
                                       advice or as a recommendation to enter into this
                                       Transaction, it being understood that information and
                                       explanations related to the terms and conditions of
                                       this Transaction shall not be considered investment
                                       advice or a recommendation to enter into this
                                       Transaction. No communication (written or oral)
                                       received from the other party shall be deemed to be
                                       an assurance or guarantee as to the expected results
                                       of this Transaction.

Please confirm that the foregoing correctly sets the terms of our agreement by executing this Confirmation and
returning it to us by facsimile transmission.

Yours sincerely,

MERRILL LYNCH CAPITAL SERVICES, INC.


*Angelina Lopes*


By:_____
Authorized Signatory


Accepted and confirmed as of the
Trade Date written above:

PRAIRIE PRIDE, INC.

By: _____
Authorized Signatory
Name:  David Swearingin
Title:  Director & Chairman of Finance Comm.

# EXHIBIT C

 **Merrill Lynch**

DATE:        JANUARY 26, 2007

TO:          PRAIRIE PRIDE, INC. ("Counterparty")
ATTENTION:   DAVID SWEARINGIN
TEL:         417-667-3300
FAX:         417-667-3066

FROM:        MERRILL LYNCH CAPITAL SERVICES, INC. ("MLCS")
CONTACT:     EDWARD BURKE
EMAIL:       edward_burkejr@ml.com
TEL:         212-449-8799
FAX:         917-778-0836

RE:          SWAP TRANSACTION

ML REF:      06DL28466, 3078850

Dear Sir or Madam:

   The purpose of this communication is to confirm the terms and conditions of the transaction entered into between us on the Trade Date specified below (the "Transaction"). This communication constitutes a "Confirmation" as referred to in the Agreement specified below.

   The definitions and provisions contained in the 2000 ISDA Definitions as published by the International Swaps and Derivatives Association, Inc. (the "Definitions") are incorporated into this Confirmation. For these purposes, all references in those Definitions to a "Swap Transaction" shall be deemed to apply to the Transaction referred to herein. In the event of any inconsistency between the Definitions and this Confirmation, the terms of this Confirmation shall govern.

   This Confirmation evidences a complete and binding agreement between you and us as to the terms of the Transaction to which this Confirmation relates. In addition, you and we agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "Master Form"), with such modifications as you and we will in good faith agree (the "Agreement"). Upon the execution by you and us of the Agreement, this Confirmation will supplement, form a part of, and be subject to the Agreement. All provisions contained in or incorporated by reference in the Agreement upon its execution will govern this Confirmation except as expressly modified below. Until we execute and deliver the Agreement, this Confirmation, together with all other documents referring to the Master Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation), shall supplement, form a part of, and be subject to, an agreement in the form of the Master Form as if we had executed an agreement in such form (but without any Schedule except for the election of the laws of the State of New York as the governing law and US Dollars as the Termination Currency) on the Trade Date of the first such Transaction between us. In the event of any inconsistency between the provisions of that agreement and this Confirmation, this Confirmation will prevail for the purpose of this Transaction.

The terms of the particular Transaction to which the Confirmation relates are as follows:

Notional Amount:                    USD 36,000,000.00 subject to amortization as set
                                    forth in Schedule A attached hereto

 **Merrill Lynch**

| | |
|---|---|
| Trade Date: | December 1, 2006 |
| Effective Date: | April 30, 2008 |
| Termination Date: | The earlier of i) April 30, 2013, subject to adjustment in accordance with the Modified Following Business Day Convention or ii) the Optional Termination Date as defined below under Other Provisions. |
| Fixed Amounts : | |
| Fixed Rate Payer : | Counterparty |
| Fixed Rate Payer Payment Date: | The 30th day of each month and the last day of each February in each year, commencing on May 30, 2008 and ending on the Termination Date, inclusive, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Fixed Rate : | 4.940000% per annum |
| Fixed Rate Payer : Day Count Fraction: | Actual/360 |
| No Adjustment of Period End Dates: | Inapplicable |
| Floating Amounts : | |
| Floating Rate Payer : | MLCS |
| Floating Rate Payer Payment Date: | The 30th day of each month and the last day of each February in each year, commencing on May 30, 2008 and ending on the Termination Date, inclusive, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | One Month |
| Spread: | Inapplicable |
| Floating Rate Payer : Day Count Fraction: | Actual/360 |
| No Adjustment of Period End Dates: | Inapplicable |

Admin No:  DCTM_ARP.doc – IDS          Page 2 of 7

 **Merrill Lynch**

| | |
|---|---|
| Reset Dates: | The first day of each Floating Rate Payer Calculation Period |
| Rate Cut-Off Dates: | Inapplicable |
| Averaging: | Inapplicable |
| Compounding: | Inapplicable |
| Business Days: | New York and London |
| Calculation Agent: | MLCS unless otherwise specified in the Agreement |
| Other Provisions: | MLCS and Counterparty agree that MLCS shall have the right to elect that in the event that the Agreement and the Credit Support Annex is not executed within 90 calendar days of the Trade Date of this Transaction, this Transaction shall be terminated effective as of the day that is 90 calendar days after the Trade Date, (or if such a day is not a Business Day, on the next succeeding Business Day)(the "Optional Termination Date"). Such right may be exercised by notice to the other party not less than five Business Days preceding the Optional Termination Date. In the event that MLCS exercises its right to terminate this Transaction, MLCS and Counterparty shall attempt to agree on an amount payable by one party to the other on the Optional Termination Date in respect of such termination. If the parties fail to agree on such an amount prior to the second Local Business Day preceding such Optional Termination Date, MLCS shall determine the "Market Quotation" for this Transaction (as defined in Section 14 of the Agreement, but based on Reference Market-makers' mid-market quotations) for value on the Optional Termination Date. The Market Quotation shall be paid by the relevant party on the Optional Termination Date, and this Transaction shall terminate on the Optional Termination Date with no further rights and obligations of either party, except for the obligation to make payment of the Market Quotation, provided, however, that if the Agreement and the Credit Support Annex is executed prior to the Optional Termination Date, then, unless the parties otherwise agree, notwithstanding that notice of termination has been given, this Transaction shall not be terminated and the Market Quotation shall not be payable hereunder. |

 **Merrill Lynch**

Non-Reliance:                    Each party represents to the other party that it is
                                 acting for its own account, and has made its own
                                 independent decisions to enter into this Transaction
                                 and as to whether this Transaction is appropriate or
                                 proper for it based on its own judgment and upon
                                 advice from such advisors as it has deemed
                                 necessary. It is not relying on any communication
                                 (written or oral) of the other party as investment
                                 advice or as a recommendation to enter into this
                                 Transaction, it being understood that information and
                                 explanations related to the terms and conditions of
                                 this Transaction shall not be considered investment
                                 advice or a recommendation to enter into this
                                 Transaction. No communication (written or oral)
                                 received from the other party shall be deemed to be
                                 an assurance or guarantee as to the expected results
                                 of this Transaction.

 **Merrill Lynch**

Please confirm that the foregoing correctly sets the terms of our agreement by executing this Confirmation and returning it to us by facsimile transmission.

Yours sincerely,

MERRILL LYNCH CAPITAL SERVICES, INC.

By:_____
Authorized Signatory

Accepted and confirmed as of the
Trade Date written above:

PRAIRIE PRIDE, INC.

By:_____
Authorized Signatory
Name:   David Swearingin
Title:   Finance Committee Chairman
         Prairie Pride, Inc.

FROM :                          FAX NO. :6605423003            Mar. 01 2007 05:08PM P7

 **Merrill Lynch**

## SCHEDULE A

| From and including* | To but excluding* | Notional Amount | USD |
|---|---|---|---|
| 30-Apr-08 | 30-May-08 | 36,000,000.00 | USD |
| 30-May-08 | 30-Jun-08 | 35,736,016.95 | USD |
| 30-Jun-08 | 30-Jul-08 | 35,457,515.07 | USD |
| 30-Jul-08 | 29-Aug-08 | 35,189,457.16 | USD |
| 29-Aug-08 | 30-Sep-08 | 34,919,385.74 | USD |
| 30-Sep-08 | 30-Oct-08 | 34,634,947.63 | USD |
| 30-Oct-08 | 28-Nov-08 | 34,360,711.02 | USD |
| 28-Nov-08 | 30-Dec-08 | 34,072,211.81 | USD |
| 30-Dec-08 | 30-Jan-09 | 33,793,748.23 | USD |
| 30-Jan-09 | 27-Feb-09 | 33,513,192.98 | USD |
| 27-Feb-09 | 30-Mar-09 | 33,194,538.38 | USD |
| 30-Mar-09 | 30-Apr-09 | 32,909,482.18 | USD |
| 30-Apr-09 | 29-May-09 | 32,610,433.75 | USD |
| 29-May-09 | 30-Jun-09 | 32,320,990.06 | USD |
| 30-Jun-09 | 30-Jul-09 | 32,017,663.78 | USD |
| 30-Jul-09 | 28-Aug-09 | 31,723,767.52 | USD |
| 28-Aug-09 | 30-Sep-09 | 31,427,663.66 | USD |
| 30-Sep-09 | 30-Oct-09 | 31,117,843.64 | USD |
| 30-Oct-09 | 30-Nov-09 | 30,817,188.40 | USD |
| 30-Nov-09 | 30-Dec-09 | 30,502,930.74 | USD |
| 30-Dec-09 | 29-Jan-10 | 30,197,656.60 | USD |
| 29-Jan-10 | 26-Feb-10 | 29,890,089.40 | USD |
| 26-Feb-10 | 30-Mar-10 | 29,546,853.65 | USD |
| 30-Mar-10 | 30-Apr-10 | 24,234,397.97 | USD |
| 30-Apr-10 | 28-May-10 | 23,908,634.74 | USD |
| 28-May-10 | 30-Jun-10 | 23,591,385.09 | USD |
| 30-Jun-10 | 30-Jul-10 | 23,260,947.69 | USD |
| 30-Jul-10 | 31-Aug-10 | 22,938,832.96 | USD |
| 31-Aug-10 | 30-Sep-10 | 22,614,298.67 | USD |
| 30-Sep-10 | 29-Oct-10 | 22,276,758.67 | USD |
| 29-Oct-10 | 30-Nov-10 | 21,947,251.23 | USD |
| 30-Nov-10 | 30-Dec-10 | 21,604,862.35 | USD |
| 30-Dec-10 | 31-Jan-11 | 21,270,307.98 | USD |
| 31-Jan-11 | 28-Feb-11 | 20,933,240.61 | USD |
| 28-Feb-11 | 30-Mar-11 | 20,563,159.40 | USD |
| 30-Mar-11 | 29-Apr-11 | 15,220,780.31 | USD |
| 29-Apr-11 | 31-May-11 | 14,865,841.42 | USD |
| 31-May-11 | 30-Jun-11 | 14,518,224.44 | USD |
| 30-Jun-11 | 29-Jul-11 | 14,158,178.56 | USD |
| 29-Jul-11 | 30-Aug-11 | 13,805,245.99 | USD |

 **Merrill Lynch**

| | | | |
|---|---|---|---|
| 30-Aug-11 | 30-Sep-11 | 13,449,662.38 | USD |
| 30-Sep-11 | 31-Oct-11 | 13,081,848.94 | USD |
| 31-Oct-11 | 30-Nov-11 | 12,720,831.55 | USD |
| 30-Nov-11 | 30-Dec-11 | 12,347,720.12 | USD |
| 30-Dec-11 | 30-Jan-12 | 11,981,188.34 | USD |
| 30-Jan-12 | 29-Feb-12 | 11,611,903.37 | USD |
| 29-Feb-12 | 30-Mar-12 | 11,221,617.38 | USD |
| 30-Mar-12 | 30-Apr-12 | 5,846,626.91 | USD |
| 30-Apr-12 | 30-May-12 | 5,459,891.57 | USD |
| 30-May-12 | 29-Jun-12 | 5,079,179.42 | USD |
| 29-Jun-12 | 30-Jul-12 | 4,686,865.38 | USD |
| 30-Jul-12 | 30-Aug-12 | 4,300,346.67 | USD |
| 30-Aug-12 | 28-Sep-12 | 3,910,924.63 | USD |
| 28-Sep-12 | 30-Oct-12 | 3,510,118.35 | USD |
| 30-Oct-12 | 30-Nov-12 | 19,114,760.54 | USD |
| 30-Nov-12 | 31-Dec-12 | 18,708,166.81 | USD |
| 31-Dec-12 | 30-Jan-13 | 18,306,785.16 | USD |
| 30-Jan-13 | 28-Feb-13 | 17,902,388.54 | USD |
| 28-Feb-13 | 28-Mar-13 | 17,471,037.01 | USD |
| 28-Mar-13 | 30-Apr-13 | 17,060,362.69 | USD |

\* Such dates are subject to Adjustment in accordance with the Modified Following Business Day Convention.

# EXHIBIT D



Client Integration & Documentation
Banc of America Securities LLC


**VIA OVERNIGHT DELIVERY**

May 3, 2010


Prairie Pride, Inc.
17700 South T Hwy
Deerfield, Missouri 64741
Telephone: 417-927-3400

<u>Attention</u>:  Dennis Alt


> **Re:**    Notice of Payment Default in connection with the Master Agreement (as defined below) and the Transactions (as defined below)


Gentlemen/Ladies:

Reference is hereby made to:

> The Interest Rate Swap Transactions (the "Transactions") by and between Merrill Lynch Capital Services, Inc. ("Merrill Lynch") and Prairie Pride, Inc. ("Counterparty"), evidenced by (i) that certain Confirmation dated as of August 17, 2006 (ML Reference No. 06DL18775, 285709), and (ii) that certain Confirmation dated as of January 26, 2007 (ML Reference No. 06DL28466, 3078850), (each, a "Confirmation", and collectively, the "Confirmations"); each of which forms a part of and is subject to an agreement in the form of the 1992 ISDA Master Agreement (Local Currency – Single Jurisdiction) (collectively, the "Master Agreement")

as such documents may be amended and supplemented from time to time.  Capitalized terms used herein and not defined shall have the meanings given to them in the Master Agreement.

The purpose of this letter is to provide Counterparty with notice of default under the Master Agreement.    Merrill Lynch hereby notifies Counterparty that a default with respect to Counterparty has occurred and is continuing under Section 5(a)(i) of the Master Agreement in

Banc of America Securities LLC, member NYSE/FINRA/SIP C, is a subsidiary of Bank of America Corporation

Banc of America Securities LLC, NY1-100-03-01
One Bryant Park, New York, New York, 10036

Recycled Paper

that Counterparty has failed to make payments in the amounts and on the payment dates specified on Annex I hereto, as per the terms of the Transactions and the Confirmations (a total amount of $2,885,442.35, collectively, the "Payment Default").

Merrill Lynch hereby notifies Counterparty that, pursuant to Section 5(a)(i) of the Master Agreement, Counterparty has three (3) Local Business Days from the date on which the notice is received to remedy the Payment Default. The failure of Counterparty to remedy the Payment Default shall result in an Event of Default under the Master Agreement, and Merrill Lynch will pursue its rights and remedies related thereto.

This notice is given without prejudice to any other rights and remedies of Merrill Lynch under the Master Agreement and/or any other agreements to seek recovery of all amounts owing to Merrill Lynch under the Master Agreement and/or any other agreements or in respect of the enforcement and protection of its rights under the Master Agreement and/or any other agreements or under any collateral or guarantees supporting any amounts owing to Merrill Lynch.

Very truly yours.

MERRILL LYNCH CAPITAL SERVICES, INC.

Ana Morales Gillard
Authorized Signatory

cc:   Peter Wilson
      Laura Liu
      Emily Ansani
      Terence Dwyer

-3-

**ANNEX I - Listing of Past Due Payments for:**

(i)  The Interest Rate Swap Transaction Reference No. 06DL18775, 285709, evidenced by the Confirmation dated as of August 17, 2006; and (ii) the Interest Rate Swap Transaction Reference No. 06DL28466, 3078850, evidenced by the Confirmation dated as of January 26, 2007.

**For Trade ID # 06DL18775:**

| ML Reference | Numbers | Payment Date | Amount |
|---|---|---|---|
| 06DL18775 | 2857059 | 2/2/2009 | $69,198.88 |
| 06DL18775 | 2857059 | 3/2/2009 | $62,937.78 |
| 06DL18775 | 2857059 | 4/1/2009 | $66,308.26 |
| 06DL18775 | 2857059 | 5/1/2009 | $66,150.00 |
| 06DL18775 | 2857059 | 6/1/2009 | $69,603.54 |
| 06DL18775 | 2857059 | 7/1/2009 | $68,666.66 |
| 06DL18775 | 2857059 | 8/3/2009 | $75,698.34 |
| 06DL18775 | 2857059 | 9/1/2009 | $66,885.21 |
| 06DL18775 | 2857059 | 10/1/2009 | $69,450.00 |
| 06DL18775 | 2857059 | 11/2/2009 | $74,293.34 |
| 06DL18775 | 2857059 | 12/1/2009 | $67,363.78 |
| 06DL18775 | 2857059 | 1/4/2010 | $79,101.98 |
| 06DL18775 | 2857059 | 2/1/2010 | $65,197.19 |
| 06DL18775 | 2857059 | 3/1/2010 | $65,224.44 |
| 06DL18775 | 2857059 | 4/1/2010 | $72,212.77 |

**TOTAL for # 06DL18775: $1,038,292.17**

**For Trade ID # 06DL28466:**

| ML Reference | Numbers | Payment Date | Amount |
|---|---|---|---|
| 06DL28466 | 3078850 | 1/30/2009 | $130,041.39 |
| 06DL28466 | 3078850 | 2/27/2009 | $118,094.31 |
| 06DL28466 | 3078850 | 3/30/2009 | $127,521.20 |
| 06DL28466 | 3078850 | 4/30/2009 | $125,186.30 |
| 06DL28466 | 3078850 | 5/29/2009 | $118,541.19 |
| 06DL28466 | 3078850 | 6/30/2009 | $132,767.45 |
| 06DL28466 | 3078850 | 7/30/2009 | $123,534.82 |
| 06DL28466 | 3078850 | 8/28/2009 | $118,959.72 |
| 06DL28466 | 3078850 | 9/30/2009 | $134,806.53 |
| 06DL28466 | 3078850 | 10/30/2009 | $121,716.15 |
| 06DL28466 | 3078850 | 11/30/2009 | $124,647.59 |
| 06DL28466 | 3078850 | 12/30/2009 | $119,620.80 |
| 06DL28466 | 3078850 | 1/29/2010 | $118,494.35 |
| 06DL28466 | 3078850 | 2/26/2010 | $109,482.72 |
| 06DL28466 | 3078850 | 3/30/2010 | $123,735.66 |

**TOTAL for # 06DL28466: $1, 847,150.18**

**TOTAL of Listed Past Due Payments for # 06DL18775 & 06DL18775: $2,885,442.35**

# EXHIBIT E



**Bank of America** 
**Merrill Lynch**

GLOBAL CORPORATE &
INVESTMENT BANKING

Client Integration Documentation
Banc of America Securities LLC

**VIA OVERNIGHT DELIVERY**

May 7, 2010

Prairie Pride, Inc.
17700 South T Hwy
Deerfield, Missouri 64741
Telephone: 417-927-3400
<u>Attention</u>:  Dennis Alt

> **Re:**    Designation of an Early Termination Date after an Event of Default in connection
> with the Master Agreement (as defined below) and the Transactions (as defined below)

Gentlemen/Ladies:

Reference is hereby made to:

1.  The Interest Rate Swap Transactions (the "Transactions") by and between Merrill Lynch
    Capital Services, Inc. ("Merrill Lynch") and Prairie Pride, Inc. ("Counterparty"),
    evidenced by (i) that certain Confirmation dated as of August 17, 2006 (ML Reference
    No. 06DL18775, 285709), and (ii) that certain Confirmation dated as of January 26, 2007
    (ML Reference No. 06DL28466, 3078850), (each, a "Confirmation", and collectively, the
    "Confirmations"); each of which forms a part of and is subject to an agreement in the
    form of the 1992 ISDA Master Agreement (Local Currency – Single Jurisdiction)
    (collectively, the "Master Agreement"); and

2.  the letter dated from Merrill Lynch to Counterparty as of May 3, 2010 that set forth the
    occurrence of a payment default with respect to the Transactions (the "Notice Letter");

as such documents may be amended and supplemented from time to time.  Capitalized terms
used herein and not defined shall have the meanings given to them in the Master Agreement.

Pursuant to Section 6(a) of the Master Agreement, Merrill Lynch hereby notifies Counterparty
that an Event of Default has occurred under Section 5(a)(i) of the Master Agreement in that
Counterparty   has   failed   to   remedy   its   payment   default   within   three   (3)

Banc of America Securities LLC member FINRA/SIPC, is a subsidiary of Bank of America Corporation

-2-

Local Business Days from the date of delivery of the Notice Letter. As a result of such Event of Default, Merrill Lynch is hereby terminating the Transactions effective May 11, 2010 and designating such day as the Early Termination Date in respect of the Transactions.

As soon as possible on or following the Early Termination Date, Merrill Lynch will send to Counterparty a statement of the amounts payable pursuant to Section 6(e)(i) of the Master Agreement.

This Event of Default Notice is without prejudice to any other rights and remedies of Merrill Lynch under the Master Agreement and/or any other agreements to seek recovery of all amounts owing to Merrill Lynch under the Master Agreement and/or any other agreements or in respect of enforcement and protection of its rights under the Master Agreement and/or any other agreements or under any collateral or guarantees supporting any amounts owing to Merrill Lynch.

Very truly yours,

MERRILL LYNCH CAPITAL SERVICES, INC.

Ana Morales Gillard
Authorized Signatory

cc:    Peter Wilson
       Laura Liu
       Emily Ansani
       Terence Dwyer

# EXHIBIT F



**Bank of America**
**Merrill Lynch**

**GLOBAL CORPORATE &**
**INVESTMENT BANKING**

Client Integration Documentation
Banc of America Securities LLC

**VIA OVERNIGHT DELIVERY**

May 14, 2010

Prairie Pride, Inc.
17700 South T Hwy
Deerfield, Missouri 64741
Telephone: 417-927-3400
Attention:  Dennis Alt

    **Re:**  Notice of Amount Payable in connection with Early Termination Date

Gentlemen/Ladies:

Reference is hereby made to:

    (1)    The Interest Rate Swap Transactions (the "Transactions") by and between Merrill
    Lynch Capital Services, Inc. ("Merrill Lynch") and Prairie Pride, Inc. ("Counterparty"),
    evidenced by (i) that certain Confirmation dated as of August 17, 2006 (ML Reference
    No. 06DL18775, 285709), and (ii) that certain Confirmation dated as of January 26, 2007
    (ML Reference No. 06DL28466, 3078850), (each, a "Confirmation", and collectively, the
    "Confirmations"); each of which forms a part of and is subject to an agreement in the
    form of the 1992 ISDA Master Agreement (Local Currency – Single Jurisdiction)
    (collectively, the "Master Agreement"); and

    (2)    the letter dated May 7, 2010 from Merrill Lynch to Counterparty (the "Early
    Termination Letter") that designated an Event of Default and Early Termination Date in
    connection with the Transactions.

Capitalized terms used herein and not defined shall have the meanings given to them in the
Master Agreement.

The Early Termination Letter designated May 11, 2010 as the Early Termination Date with
respect to the Transactions.

Banc of America Securities LLC member FINRA/SIPC, is a subsidiary of Bank of America Corporation

Banc of America Securities LLC
One Bryant Park, NY, NY 10036

♻Recycled Paper

-2-

Pursuant to Section 6(e) of the Master Agreement, the sum of **$6,416,210.87**, (which includes past due payments in the aggregate amount of $3,059,960.87), plus appropriate interest, is due and payable on the effective date of this written notice in respect of both the Settlement Amount and the Unpaid Amounts for the Transaction. See Annex I for the calculation statement pursuant to Section 6(d)(i) of the Master Agreement. Payment should be made promptly to Merrill Lynch in accordance with established payment instructions.

In accordance with Section 6(d)(ii) of the Master Agreement, interest will accrue on the Settlement Amount and any Unpaid Amounts from and including the Early Termination Date to but excluding the date of payment in full. Such interest is payable at the Applicable Rate on the basis of daily compounding and the actual number of days elapsed. We certify that the Applicable Rate is the rate per annum equal to the sum of (a) the BBA LIBOR Daily Floating Rate and (b) 1% per annum, being the rate per annum equal to the cost to Merrill Lynch if it were to fund the Settlement Amount and any Unpaid Amounts plus 1% per annum. The "BBA LIBOR Daily Floating Rate" is a fluctuating rate of interest equal to the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as selected by Merrill Lynch from time to time) as determined for each day at approximately 11:00 a.m. London time for U.S. Dollar deposits with a one month term, as adjusted from time to time in Merrill Lynch's sole discretion for reserve requirements, deposit insurance assessment rates and other regulatory costs; provided that (1) if such day is not a London Banking Day, the BBA LIBOR for such day shall be such rate on such transaction on the next preceding London Banking Day as so published and (2) if such rate is not available at such time for any reason, then the rate for that day will be determined by such alternate method as reasonably selected by Merrill Lynch. A "London Banking Day" is a day on which banks in London are open for business and dealing in offshore dollars.

Nothing in this notice shall be deemed to constitute a waiver of any default, Event of Default, Termination Event or similar event not specified herein or in the Early Termination Letter. In addition, any acceptance by Merrill Lynch or its affiliates of performance from, or performance by, Merrill Lynch or any of its affiliates to Counterparty under the Transactions, any other agreement between Merrill Lynch or any of its affiliates to Counterparty or any of its affiliates or otherwise (including, without limitation, the rollover of, or entry into, any transactions under, or amendments, supplements, or modifications to, any agreement or otherwise), or any delay in exercising any remedies Merrill Lynch or any of its affiliates may have, shall not constitute a waiver or forbearance of any rights or remedies Merrill Lynch or any of its affiliates may have.

Please be advised that no verbal communication from or on behalf of Merrill Lynch or its affiliates by any party shall constitute any agreement, commitment, or evidence of any assurance or intention of Merrill Lynch or its affiliates with respect to the subject matter hereof. Any agreement, commitment, assurance, or intention of Merrill Lynch or its affiliates shall be effective only if in writing and duly executed on behalf of Merrill Lynch or such affiliate (it

-3-

being understood that no e-mail or other form of electronic communication from or on behalf of Merrill Lynch or its affiliates shall constitute or be construed as a "writing" or a "signature" in respect of any such alleged "writing" for purposes of enforcing any agreement, commitment, assurance or intention of Merrill Lynch or its affiliates).

This letter is without prejudice to any other rights or remedies at law or in equity available to Merrill Lynch under or with respect to the Master Agreement, the Transaction and/or any other agreements or in respect of enforcement and protection of its rights thereunder or under any collateral or guarantees supporting any amounts owing to Merrill Lynch.

Very truly yours,

MERRILL LYNCH CAPITAL SERVICES, INC.

Ana Morales Gillard
Authorized Signatory

cc:    Peter Wilson
       Laura Liu
       Emily Ansani
       Terence Dwyer

-4-

## ANNEX I

**Termination Payment Amount for the following Transactions**:

1.    The Interest Rate Swap Transaction Reference No. 06DL18775, 285709, evidenced by the Confirmation dated as of August 17, 2006 ("Trade ID # 06DL18775"); and

2.    The Interest Rate Swap Transaction Reference No. 06DL28466, 3078850, evidenced by the Confirmation dated as of January 26, 2007 ("Trade ID # 06DL28466")

**For Trade ID # 06DL18775:**

| | |
|---|---|
| (A) Market Quotations from Reference Market-maker 2 (Disregarding the highest and lowest quotations) | =USD  $1,694,000.00 |
| (B) Unpaid Amounts owed to Merrill Lynch | = USD  $1,114,872.27 |
| Termination Payment Amount [(A) + (B)] | = USD  $2,808,872.27 |

Calculation Statement pursuant to Section 6(d)(i) of the Master Agreement

Pursuant to Section 6(e) of the Master Agreement, the following are Market Quotations requested and received by Merrill Lynch as at May 11, 2010:

| | |
|---|---|
| Reference Market-maker 1 | USD $1,693,000 |
| Reference Market-maker 2 | USD $1,694,000 |
| Reference Market-maker 3 | USD $1,699,300 |

Calculation of Unpaid Amounts Owed to Merrill Lynch (see attached Annex II)

**For Trade ID # 06DL28466:**

| | |
|---|---|
| (A) Market Quotations from Reference Market-maker 2 (Disregarding the highest and lowest quotations) | =USD  $1,662,250 |
| (B) Unpaid Amounts owed to Merrill Lynch | = USD  $3,607,339.00 |
| Termination Payment Amount [(A) + (B)] | = USD  $2,808,872.27 |

Calculation Statement pursuant to Section 6(d)(i) of the Master Agreement

Pursuant to Section 6(e) of the Master Agreement, the following are Market Quotations requested and received by Merrill Lynch as at May 11, 2010:

| | |
|---|---|
| Reference Market-maker 1 | USD $1,658,000 |
| Reference Market-maker 2 | USD $1,662,250 |
| Reference Market-maker 3 | USD $1,672,600 |

Calculation of Unpaid Amounts Owed to Merrill Lynch (see attached Annex II)

Recycled Paper

-5-

## ANNEX II

Calculation of Unpaid Amounts Owed to Merrill Lynch

### For Trade ID # 06DL18775:

| Reference Number | Scheduled Payment Date | Unpaid Amount |
|---|---|---|
| 06DL18775 | 2/2/2009 | $69,198.88 |
| 06DL18775 | 3/2/2009 | $62,937.78 |
| 06DL18775 | 4/1/2009 | $66,308.26 |
| 06DL18775 | 5/1/2009 | $66,150.00 |
| 06DL18775 | 6/1/2009 | $69,603.54 |
| 06DL18775 | 7/1/2009 | $68,666.66 |
| 06DL18775 | 8/3/2009 | $75,698.34 |
| 06DL18775 | 9/1/2009 | $66,885.21 |
| 06DL18775 | 10/1/2009 | $69,450.00 |
| 06DL18775 | 11/2/2009 | $74,293.34 |
| 06DL18775 | 12/1/2009 | $67,363.78 |
| 06DL18775 | 1/4/2010 | $79,101.98 |
| 06DL18775 | 2/1/2010 | $65,197.19 |
| 06DL18775 | 3/1/2010 | $65,224.44 |
| 06DL18775 | 4/1/2010 | $72,212.77 |
| 06DL18775 | 5/4/2010 | $76,580.10 |
| | Total: | USD $1,114,872.27 |

### For Trade ID # 06DL28466:

| Reference Number | Scheduled Payment Date | Unpaid Amount |
|---|---|---|
| 06DL28466 | 1/30/2009 | $130,041.39 |
| 06DL28466 | 2/27/2009 | $118,094.31 |
| 06DL28466 | 3/30/2009 | $127,521.20 |
| 06DL28466 | 4/30/2009 | $125,186.30 |
| 06DL28466 | 5/29/2009 | $118,541.19 |
| 06DL28466 | 6/30/2009 | $132,767.45 |
| 06DL28466 | 7/30/2009 | $123,534.82 |
| 06DL28466 | 8/28/2009 | $118,959.72 |
| 06DL28466 | 9/30/2009 | $134,806.53 |
| 06DL28466 | 10/30/2009 | $121,716.15 |
| 06DL28466 | 11/30/2009 | $124,647.59 |
| 06DL28466 | 12/30/2009 | $119,620.80 |
| 06DL28466 | 1/29/2010 | $118,494.35 |
| 06DL28466 | 2/26/2010 | $109,482.72 |
| 06DL28466 | 3/30/2010 | $123,735.66 |
| 06DL28466 | 4/30/2010 | $ 97,938.42 |
| | Total: | USD $ 1,945,088.60 |

TOTAL of Unpaid Amounts for # 06DL18775 & 06DL18775:USD $3,059,960.87

Recycled Paper